**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **S9 04 Cr. 186 (SCR)** |
| | **MEMORANDUM DECISION AND ORDER.** |
| **v.** | |
| **KHALID BARNES,** | |
| **Defendant.** | |

_____

**STEPHEN C. ROBINSON, United States District Judge:**

In this capital case, defendant Khalid Barnes[1] is charged with, *inter alia*, racketeering, narcotics distribution, and murder. Defendant currently moves for a stay in the proceedings pursuant to the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861, et seq. (herein after "JSSA"), and the Sixth Amendment. Defendant's motion is denied.

**I. Factual Background**

The procedures for the selection of residents for jury service in the Southern District of New York is set forth in *The Amended Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York. See Declaration of Erik B. Levin*, Ex. 1 (hereinafter "Jury Plan"). The Jury Plan establishes two Master Jury Wheels for the district, which are constituted every four years. The Master Jury Wheel for the Foley Square courthouse in Manhattan draws from New York, Bronx, Westchester, Putnam and Rockland counties. The Northern Division wheel for the White Plains courthouse draws from Westchester, Putnam, Rockland, Orange, Sullivan and Dutchess counties. The Master Jury Wheels are drawn from lists of registered voters in these counties. *See Jury Plan*, Article III.C.

At least once a year, and at times determined by the Chief Judge, the Clerk of the Court draws from the Master Jury Wheels the names of persons to whom questionnaires are sent to determine their qualification and availability for jury service. Based on their answers to these questionnaires a list of persons eligible for jury service is established as the Qualified Jury Wheel.

---

[1] By letter dated October 1, 2007, Defendant Tuere Barnes indicated that he also wished to join in this motion.

1

Defendant submits an analysis of the demographic composition of the Master and Qualified Jury Wheels for the Southern District of New York based on the current Master Jury Wheel, established in September 2005, and scheduled to be re-constituted in September 2009.  *See Second Declaration of Erik B. Levin*, Ex. 2 (hereinafter "the Report").[2]  Based on an analysis of the Master and Qualified Jury Wheels, as well as demographic information based on "the use of contemporary geographic analytic procedures", *see The Report* at 6 n.7, the Report concludes that both the Master and Qualified Jury Wheels under-represent African-Americans and Hispanic-Americans.  In particular, the report finds the following:

1. Non-Hispanic Whites-Americans (hereinafter "White-Americans" are 71.56% of the population in the counties comprising the Northern Division of the Southern District of New York, are 73.36% of the voting age population, are 75.56% of the Master Jury Wheel, and are 78.10% of the Qualified Jury Wheel.  *Report* at Table 11.
2. Non-Hispanic African-Americans (hereinafter "African-Americans") are 10.66% of the population of the Northern Division counties, are 10.17% of the voting age population, are 8.92% of the Master Jury Wheel, and are 7.42% of the Qualified Jury Wheel.  *Id.*
3. Hispanic-Americans are 12.19% of the population of the Northern Division Counties, are 11.24% of the voting age population, are 10.07% of the Master Jury Wheel, and are 8.96% of the Qualified Jury Wheel.  *Id.*
4. White-Americans are therefore overrepresented by approximately 5% in the Qualified Jury Wheel relative to their voting age population, while African-Americans are underrepresented by 2.8% and Hispanic-Americans are underrepresented by 2.3%.[3]  *Id.* at 13.
5. Calling into question the utility of using the above statistics, the Report uses alternative statistical methods, referred to as binomial probability distributions[4] to conclude that there is a 28.5% chance that African-Americans will be selected for a 60 person jury panel in proportion to their population, and a 29.0% chance in the case of Hispanic-Americans.  *Id.* at 18.
6. Using similar methods, the Report concludes that the probability of under-representation in the case of African-Americans is 53.8%, and is 54.7% in the case of Hispanic-Americans.  *Id.* at 19.

The government does not dispute the accuracy of defendant's statistical analysis, but does dispute the applicability of his experts' methodology.

---

[2] The analysis was conducted by Columbia University Professors Jeffrey Fagan, Andrew Gelman, and David Epstein, and Columbia law student Jared Ellias.

[3] The authors note that the under-representation of Hispanic-Americans may be as high as 7% if data from the Qualified Jury Wheel database, rather than the authors' demographic techniques, is used.  Nevertheless, the authors themselves discredit this data because of the large number (35.44%) of persons whose Hispanic origin (or lack thereof) is known.

[4] As stated by defendant's experts, "[b]inomial distributions model discrete random variables and show the probability of an outcome *x* given a population *p*.  Typically, a binomial random variable is the number of successes in a series of trials, for example, the number of "heads" occurring when a coin is tossed 50 times."  *See Report* at 15 n.17.

2

Case 1:04-cr-00186-LAP   Document 298   Filed 10/17/07   Page 3 of 6

**II. Analysis**

"The Sixth Amendment guarantees a criminal defendant a jury selected from a fair cross section of the community." *See United States v. Rioux*, 97 F.3d 648, 654 (2d Cir. 1996)(citing *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975)). In addition, the JSSA states that, "[i]t is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."

The JSSA provides that a criminal defendant may move a court to stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury. *See* 28 U.S.C. 1867(a). Challenges under both the Sixth Amendment and the JSSA are analyzed under a three part test established in *Duren v. Missouri*. *See* 439 U.S. 357, 364 (1979); *see also Rioux*, 97 F.3d at 654, 660. Under *Duren*, in order to establish a prima facie case of a violation of the fair cross-section requirement, a defendant must show: (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Duren*, 439 U.S. at 364; *Rioux*, 97 F.3d at 654.

**A. Distinctive Groups**

The government does not contest that African-Americans and Hispanic-Americans are "distinctive" groups under *Duren*. *See Rioux*, 97 F.3d at 654 ("[African-Americans and Hispanic-Americans] are unquestionably 'distinctive' groups for the purposes of a fair-cross-section analysis.")(citing *United States v. Jackman*, 46 F.3d 1240, 1246 (2d Cir. 1995)).

**B. Measuring Representation**

The parties' primary dispute is over the proper method of measuring whether African-Americans and Hispanic-Americans are underrepresented in the Qualified Jury Wheel in the Northern Division. The government argues that an absolute disparity approach is appropriate. This Court agrees.

The absolute disparity method measures the difference between a group's representation in the general population and the group's representation in the Qualified Jury Wheel. *See Rioux*, 97 F.3d at 655. In this case, for example, African-Americans are 10.17% of the voting age population, and 7.42% of the Qualified Jury Wheel, resulting in an approximately 2.8% disparity. Hispanic-Americans constitute 11.24% of the voting age population and 8.96% of the Qualified Jury Wheel, resulting in an approximately 2.3% disparity.

Use of the absolute disparity method is appropriate in this case. First, the absolute disparity approach is the primary approach used in this Circuit. In *Rioux*, the Second Circuit's most recent pronouncement on the subject, the Circuit noted that while the absolute disparity method had been questioned and rejected in particular instances, it was the most commonly used method of measuring proportional representation for purposes of the fair cross-section right. *See id.* at 655-56; *see also United States v. Biaggi*, 909 F.2d 662, 678 (2d Cir. 1990); *United States v. Rosario*, 820 F.2d 584, 585 (2d Cir. 1987); *Anderson v. Casscles*, 531 F.2d 682, 685 (1976); *United States v. Jenkins,* 496 F.2d 57, 66 (1974). Accordingly, despite acknowledging its limitations, the *Rioux* court adopted the absolute disparity methodology for that case. 97 F.3d at 655.

This Court finds *Rioux* to be controlling here. While defendant primarily argues, and this Court agrees, that the value of absolute disparity methodology is questionable when the group being analyzed is a small percentage of the population[5], the percentages of African-Americans and Hispanic-Americans in *Rioux* were actually *smaller* than the 10.17% and 11.24% found here. *See id.* at 656 (noting that African-Americans were 8.33% of the population, while Hispanic-Americans were 5.18%).

Second, defendant's reliance on *United States v. Jackman* is misplaced. 46 F.3d 1240 (1995). In *Jackman* the Second Circuit declined to use the absolute disparity approach for three reasons. First, the absolute disparity method was of questionable utility when the minority population is a small percentage of the total. *Id.* at 1247. Second, the selection practices at issue there, which excluded whole towns with significant minority populations, were not benign. *Id.* Third, there was insufficient data to support the argument that the representations in the venire selected in any one case were only slight departures from proportionality. *Id.* In contrast, as discussed already, the small percentages of African-Americans and Hispanic Americans in the community are not sufficient to justify a departure from absolute numbers methodology. In any event, a "small minority population alone is not enough to preclude the absolute numbers method." *See Rioux*, 97 F.3d at 656. (citing *Biaggi*, 909 F.2d at 678). In addition, just as in *Rioux*, and unlike in the case of *Jackman*, the challenge here is based on a "benign" use of voter registration lists to create the Master Jury Wheel.[6] *See id.* Furthermore, just as in *Rioux*, there is no indication of a lack of data availability rendering the absolute numbers methodology inapplicable. *See id.*

Finally, defendant's reliance on *Alston v. Manson* is also misplaced. 791 F.2d 255 (2d Cir. 1986). *Alston* rejected the absolute disparity method, instead using Statistical

---

[5] To illustrate, where a minority group is 45% of the population, but represents 35% of the jury pool, this 10% absolute disparity is much less significant than if the group was 11% of the population, yet only represented 1% of the jury pool.

[6] Defendant contests that the use of voter registration lists is benign because of the under-representation of minorities in voter registration. While not unaware of this under-representation, the Court does not believe it is sufficient to qualify the use of voter lists as "benign". First, if under-representation itself was sufficient to qualify a procedure as not "benign", this would effectively merge the first two factors considered by the *Jackman* court. Second, the Second Circuit has already indicated that the use of voter lists is benign. *See Rioux*, 97 F.3d at 656.

Decision Theory ("SDT"), in assessing a Fourteenth Amendment Equal Protection challenge. Specifically, SDT was used to establish intent for purposes of the Equal Protection claim. *See id.* at 258. While the Circuit in that case was critical of the absolute disparity methodology in assessing Sixth Amendment fair cross-section claims, it later specifically declined to adopt the approach of the *Alston* court for such claims. *See Rioux*, 97 F.3d at 656.

In short, this Court finds *Rioux* to be indistinguishable and controlling in the instant case, and thus holds that the absolute disparity methodology is the appropriate method for assessing defendant's fair cross-section claim.

### C. Under-Representation in this Case

Application of the absolute numbers analysis to this case is straightforward, and reveals no constitutional infirmity. African-Americans are underrepresented by approximately 2.8% and Hispanic-Americans by approximately 2.3%. This would require the addition of between one and two African-Americans and one and two Hispanic-Americans to a 60 person venire in order to reach proportionality. Similar figures have been repeatedly held to not support a fair cross-section claim. *See, e.g.*, *Rioux*, 97 F.3d at 657-58 (1.58% disparity, requiring the addition of two African-Americans to a pool of 125, and 2.14% disparity, requiring the addition of between two and three Hispanic-Americans is insufficient to sustain a fair cross-section claim); *Biaggi*, 909 F.2d at 678 (where the district court found a disparity of 3.6% for African-Americans and 4.7% for Hispanic-Americans, necessity of adding two African-Americans and two to three Hispanic-Americans to a venire to reach proportionality insufficient to maintain a fair cross-section claim); *Jenkins*, 496 F.2d at 66 (2.15% disparity, requiring the addition of one additional African-American to a 60 person venire insufficient to sustain a fair cross-section claim). This Court sees no reason to depart from these cases. Defendant has therefore failed to demonstrate a prima facie fair cross-section claim under the JSSA and Sixth Amendment.

### III. Conclusion

For the reasons stated above, defendant's motion for a stay of the proceedings pursuant to the Jury Selection and Service Act is denied.

*It is so ordered.*

Dated: White Plains, New York
       October 15, 2007

Stephen C. Robinson, U.S.D.J.