**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA**                    S9  04 Civ. 186 (SCR)

                                                                **MEMORANDUM DECISION**
                        **v.**                                          **AND ORDER**

**KHALID BARNES**
_____

**STEPHEN C. ROBINSON, United States District Judge:**

Khalid Barnes ("Defendant"), along with two of his brothers, Dawud Barnes and

Tuere Barnes, are charged with multiple crimes allegedly related to their participation in

an enterprise the Government refers to as the "Barnes Brothers Organization."[1]

Defendant is charged with, _inter alia_, racketeering, narcotics distribution, and murder.

On January 19, 2006, the Government served a Notice of Intent to Seek the Death

Penalty against Khalid Barnes (the "Notice of Intent") for his alleged involvement in the

murders of Demond Vaughan and Sergio Santana.

Defendant now challenges the constitutionality of the Federal Death Penalty Act,

18 U.S.C. §§ 3591 _et seq._ ("FDPA") and its application to this case.[2]  Further, the

Government asks this Court to file an amended Notice of Intent.  For the reasons set forth

below, Defendant's motions are DENIED and the Government is granted leave to file its

amended Notice of Intent.

---

[1] A fugitive, Anthony Paulino, is the fourth co-defendant.
[2] There are two federal capital punishment schemes, the Anti-Drug Abuse Amendments ("ADAA"), 21 U.S.C. § 848(e), and the Federal Death Penalty Act of 1994 ("FDPA"), 18 U.S.C. § 3591 _et seq._  The Government had originally sought the death penalty under both in this case. However, in a letter to this Court on September 15, 2006, the Government stated that it had decided not to proceed with any of the Title 21 Continuing Criminal Enterprise counts, including the capital counts.  Accordingly, Barnes is now eligible for the death penalty only under the FDPA.

## I. Background

On November 1, 2004, a federal grand jury returned a twenty-nine count superceding indictment (the "S2 Indictment"), charging thirteen individuals, including Defendant, with crimes relating to their alleged participation in the Barnes Brothers Organization. The Government alleges that the Barnes Brothers Organization is a violent narcotics distribution ring that operated in and around Peekskill, New York. The S2 Indictment added four counts of capital murder against Khalid Barnes for the murders of Demond Vaughan and Sergio Santana. The S2 Indictment also included a Notice of Special Findings, alleging the existence of certain threshold factors rendering the capital counts eligible for punishment by death.

In its January 19, 2006 Notice of Intent, the Government specifically declared its intention to seek a sentence of death in the event the jury convicts Khalid Barnes of murder. The Notice of Intent also included the particular statutory proportionality factors, *see* 18 U.S.C. § 3591(a)(2), the statutory aggravating factors, *see* 18 U.S.C. § 3592(c), and the non-statutory aggravating factors, *see* 18 U.S.C. § 3593(a)(2), the Government intends to prove at trial to justify a sentence of death.

On August 7, 2006, a federal grand jury returned a thirty-eight count ninth superceding indictment (the "S9 Indictment"), charging Defendant and his two brothers with multiple crimes arising out of their alleged involvement with the Barnes Brothers Organization. The S9 Indictment charges Khalid Barnes with, *inter alia*, racketeering, in violation of 18 U.S.C. § 1962, racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), various substantive narcotics distribution charges, various gun possession charges, in violation 18 U.S.C. § 924(c), and the murders of Demond Vaughan and

Sergio Santana by the use of a firearm during and in relation to, or in furtherance of, a drug trafficking crime or a crime of violence, in violation of 18 U.S.C. § 924(j). The S9 Indictment also included a Notice of Special Findings, alleging the existence of certain threshold factors rendering the capital counts eligible for punishment by death.

The Government has asked this Court for permission to file an amended Notice of Intent that relates to the S9 Indictment. The Government provided this Court and Defendant a proposed amended Notice of Intent that it wishes to file.

**II. The Government's Request To File An Amended Notice Of Intent**

In a letter dated September 5, 2006, the Government asked this Court to permit it to file an amended Notice of Intent. Defendant argues that the Government should not be permitted to amend its Notice of Intent because the Government does not have "good cause" for the filing of the Amended Notice of Intent and because each of the additional factors the Government wishes to add are not properly charged.

**A. Good Cause**

Under the FDPA, a "court may permit the attorney for the government to amend the notice upon a showing of good cause." 18 U.S.C. § 3593(a). The statute, however, does not explain what "good cause" is. Defendant asserts that the Government has not shown good cause because none of the four new non-statutory aggravating factors are premised on any information that was not already known to the Government on January 19, 2006, when it filed the initial notice. In other words, Defendant urges this Court to require the Government to show "excusable neglect." However, Defendant has not identified any instance where a court found that the government must show "excusable

neglect" to amend a notice of intent. Indeed, this Court has only found cases that stand

for the proposition that good cause is shown whenever the government can demonstrate

that there was no deliberate delay by the government and no prejudice to the defendant.

*See, e.g.*, *United States v. Taveras*, 436 F. Supp.2d 493, 502 (E.D.N.Y. 2006) ("Good

cause is demonstrated where 'the government's application was made in good faith and

the defendant was not prejudiced.'" (quoting *United States v. Pitera*, 795 F. Supp. 571,

573 (E.D.N.Y. 1992)); *see also United States v. Cuff*, 38 F. Supp.2d 282, 285 (S.D.N.Y.

1999) ("Absent some showing of an unlawful or improper motive in the government's

charging decision, or its timing, I have no authority to compel the government to prove

excusable neglect."). Judge Ackerman's opinion in *United States v. Pretlow*, 770 F.

Supp. 239, 242 (D.N.J. 1991), is particularly persuasive:

> Similar to any superseding indictment, an amendment of
> these notices has potentially onerous consequences for the
> defendant. However, when evaluating whether such an
> amendment should be permitted, the focus should be less
> on the substantive content of the information being
> communicated which will almost always be burdensome
> and more on whether notice was fairly provided in
> sufficient time for the defendant to adequately prepare his
> response. Put differently, this court sees no reason to insist
> on the more stringent excusable neglect standard. A
> definition of good cause which emphasizes the good faith
> of the government and any resulting prejudice to the
> defendant is sufficient to protect the defendant's and the
> public's interest in adequate notice.

*Id.*

Accordingly, the Court concludes that the government is permitted to amend a

notice of intent under 3593(a) where there is no deliberate delay by the government and

no prejudice to the defendant. Because there is no evidence – nor does Defendant allege

– any deliberate delay on the part of the Government, and because Defendant does not assert that he suffered any prejudice from the timing of the Amended Notice of Intent[3], the Court concludes that there is good cause for the Government to amend its Notice of Intent.

## B. Additional Factors

Defendant argues that the Government has not properly charged three of the non-statutory aggravating factors in its draft Amended Notice of Intent. Specifically, Defendant asserts that this Court should not permit the Government to include the non-statutory aggravating factors of Defendant's prior conviction, contemporaneous convictions, and potential to be a continuing danger.

As explained below, Defendant's request to strike these three non-statutory aggravating factors from the Amended Notice of Intent is denied. However, a "pre-trial motion such as the one under consideration here is normally not the place to test the sufficiency of the government's evidence with respect to aggravating factors because notices of intent generally need not list specific evidence." *United States v. Williams*, No. 00-1008, 2004 WL 2980027, at *17 (S.D.N.Y. December 22, 2004). Accordingly, Defendant may renew his objections once this Court has the benefit of a full evidentiary record, and will be in a position to better evaluate whether these factors may properly be considered by the jury during the penalty phase of the trial.

---

[3] The trial in this case is currently scheduled to begin approximately a year from the date Defendant received a draft of the Amended Notice of Intent.

### 1. Prior Conviction

Defendant argues that this Court must strike the non-statutory aggravating factor relating to his 1999 conviction for Interstate Travel in Aid of Racketeering because it does not fall within the three categories of prior convictions that are statutory aggravating factors. *See* 18 U.S.C. §§ 3592(c)(2) – (4). Simply because Congress specified that certain crimes were sufficiently serious to be statutory aggravating factors, it does not necessarily follow that it intended to forbid the introduction of other crimes as non-statutory aggravating factors. Rather, "in light of the wide agreement in the courts that a defendant's prior criminal history, including for drug violations, is a permissible non-statutory aggravating factor, we must reject [Defendant's] argument at this point." *Williams*, 2004 WL 2980027, at *20 (collecting cases).

### 2. Contemporaneous Convictions

Defendant argues that the non-statutory aggravating factor for contemporaneous (or simultaneous convictions) should be also be stricken as "more of the same". *Def. Letter of September 20, 2006* at 2-3. It is unclear what Defendant's precise argument is, but to the extent that he argues (as he does with respect to his prior conviction) that the contemporaneous convictions should be stricken because they do not fall within the three categories of prior convictions that are statutory aggravating factors, *see* 18 U.S.C. §§ 3592(c)(2) – (4), his argument fails for the same reason as in the case of his prior conviction. More generally, non-statutory aggravating factors based on contemporaneous or simultaneous convictions are not prohibited. *Williams*, 2004 WL 2980027, at *21-22

(refusing to strike a non-statutory aggravating factor of contemporaneous convictions);

*United States v. Sampson*, 275 F. Supp.2d 49, 107-08 (D. Mass. 2003).


### 3. Continuing Danger

Defendant argues that this factor is unconstitutionally vague and overbroad. However, the Supreme Court has found that an aggravating factor of continuing danger is not unconstitutionally vague. *See Jurek v. Texas*, 428 U.S. 262, 274-76 (1976); *Tuilaepa v. California*, 512 U.S. 967, 974 (1994) (citing *Jurek* with approval); *Williams*, 2004 WL 2980027, at *19 ("The vagueness argument has been rejected by the Supreme Court, however, and we must therefore do the same."). Moreover, the Court also rejects Defendant's argument that this factor is overbroad. Defendant asserts that continuing danger "may be viewed by a jury as applying to *all* murderers." *Def. Letter of Sept. 20, 2006* at 4. He has not, however, shown that "the sentencer fairly could conclude that [it] applies to every defendant eligible for the death penalty." *Arave v. Creech*, 507 U.S. 463, 474 (1993). Accordingly, the aggravating factor of continuing danger is not unconstitutionally overbroad. *See Williams*, 2004 WL 2980027, at *19-20 (rejecting the over breadth argument for the aggravating factor of future dangerousness); *see generally United States v. Bin Laden*, 126 F. Supp.2d 256, 303-04 (S.D.N.Y. 2000)(stating that "lower courts have uniformly upheld future dangerousness as a non-statutory aggravating factor in capital cases under the FDPA" and collecting cases).

Defendant also argues that the continuing danger factor as it is currently written does not account for the fact that if he is convicted of any of the capital counts in the S9 Indictment but spared the death penalty, he will spend the rest of his life in prison.

Defendant asserts that any aggravating factor of continuing danger must be put in this context. At oral argument, the Government conceded this point. Accordingly, the Government's Amended Notice of Intent should reflect this concession.

In sum, the Government may file its Amended Notice of Intent.

## III. Defendant's Death Penalty Motions

## A. Frequency of the Federal Death Penalty's Application

Defendant argues that this Court should strike down the FDPA because it is infrequently sought or imposed. In advancing his argument, Defendant principally relies on the Supreme Court's opinion in *Furman v. Georgia*, 408 U.S. 238 (1972). In *Furman*, the Court, in a per curiam, one paragraph opinion, held "that the imposition and carrying out of the death penalty in these cases constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." *Id.* at 239-40. Several of the Justices who wrote concurring opinions concluded that the infrequency of death sentences was at least one factor that led them to find the death penalty unconstitutional. *See id.* at 293 (Brennan, J., concurring) ("When the punishment of death is inflicted in a trivial number of the cases in which it is legally available, the conclusion is virtually inescapable that it is being inflicted arbitrarily. Indeed, it smacks of little more than a lottery system."); *id.* at 309-10 (Stewart, J., concurring) ("These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. . . . I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed."); *id.* at 312-13 (White, J., concurring) ("A

penalty with such negligible returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment. . . . I cannot avoid the conclusion that as the statutes before us are now administered, the penalty is so infrequently imposed that the threat of execution is too attenuated to be of substantial service to criminal justice.").  Since *Furman*, the Court has recognized that the infrequency of the death penalty was of significant issue underlying the decision.  *See, e.g.*, *Thompson v. Oklahoma*, 487 U.S. 815, 831 (1988) ("[T]he infrequent and haphazard handing out of death sentences by capital juries was a prime factor underlying our judgment in *Furman v. Georgia* that the death penalty, as then administered in unguided fashion, was unconstitutional." (citations omitted)).

While the death penalty's infrequency of application concerned the members of the Court in *Furman*, the Court later made clear that:

> the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information.

*Gregg v. Georgia*, 428 U.S. 153, 195 (1976).  Because the FDPA creates a bifurcated proceeding where the jury is apprised of the relevant information and the jury is guided in the use of that information, the FDPA "fully meets the requirements established in *Gregg* for guiding the discretion of the jury in a capital case."  *Sampson*, 275 F. Supp.2d at 88; *see also Williams*, 2004 WL 2980027, at *6; *United States v. O'Driscoll*, 203 F. Supp.2d 334 (M.D. Pa. 2002); *United States v. Hammer*, 25 F. Supp.2d 518, 546-47 (M.D. Pa.

1998).  Indeed, Defendant does not argue that the FDPA does not meet the requirements of *Gregg*.

Rather, Defendant argues "[a]fter 18 years of experience (1988-2006), it is now apparent that the federal death penalty is sought and imposed far more rarely than in the cases being examined by *Furman*."  *Def. Mem.* at 33.  Essentially, Defendant is challenging the Court's conclusion in *Gregg* that "the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance."  *Gregg*, 428 U.S. at 195; *see also id.* at 181-82 ("[T]he relative infrequency of jury verdicts imposing the death sentence does not indicate rejection of capital punishment *per se*. Rather, the reluctance of juries in many cases to impose the sentence may well reflect the humane feeling that this most irrevocable of sanctions should be reserved for a small number of extreme cases."); *McCleskey v. Kemp*, 481 U.S. 279, 308 (1987)("Because McCleskey's sentence was imposed under Georgia sentencing procedures that focus discretion on the particularized nature of the crime and the particularized characteristics of the individual defendant, we lawfully may presume that McCleskey's death sentence was not wantonly and freakishly imposed, and thus that the sentence is not disproportionate within any recognized meaning under the Eighth Amendment.")(citations and quotations omitted).

As evidence of his claim, Defendant asserts that only approximately 2.2% of all potentially death-eligible federal defendants are actually sentenced to death, while in *Furman*, less than 20% of defendants charged with capital crimes were actually

sentenced to death.[4]  While Defendant may be correct that the current federal death penalty is so "hopelessly and irremediably arbitrary, capricious and inconsistent" that it is unconstitutional, *Def. Reply Mem.* at 8, such a finding is not ours to make. Only the Supreme Court can overrule its conclusion in *Gregg* to find that the FDPA, even though it satisfies *Gregg*, it is unconstitutional.

Accordingly, Defendant's motion is denied with respect to the frequency the federal death penalty is imposed.  *See Williams*, 2004 WL 2980027, at *6 (finding that the FDPA is constitutional even if it is rarely sought or imposed).

## B.  Consistency of the Federal Death Penalty's Application

Defendant next argues that the federal death penalty is unconstitutional because there is no principled basis for distinguishing between the cases where the death penalty is imposed and the other cases where it is not imposed.  In support of his argument, Defendant provided this Court with "thumbnail compilations" of all authorized federal death penalty cases since 1988 and verdict sheets from cases that reached the penalty phase, which reflect the jury's findings in aggravation and mitigation.  *Def. Mem.* at 36. Defendant asserts that this information "provide[s] valuable insight into the hopelessly irremediable problem of arbitrariness and caprice that marks the administration of the federal death penalty system."[5]  *Def. Mem.* at 36.

---

[4] For the purposes of this motion, this Court will assume that Defendant's figures are correct.

[5] Defendant also argues that these cases illustrate "the inherently (and fatally) contradictory nature of two lines of Supreme Court cases." Def. Mem. at 42.  In *Gregg*, the Court observed, relying on *Furman*, that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  *Gregg*, 428 U.S. at 189.  However, in cases such as *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court held that while a jury's discretion to impose a sentence of death must be guided and channeled, a jury's discretion to impose a life sentence could not be limited.  As Defendant observes, "[t]his battle has

"Defendant['s] premise-that an examination of the case summaries and verdict sheets that they have submitted must reveal a principled basis on which to distinguish cases in which federal juries have imposed the death penalty from those in which they have not-is not supported by the case law." *Williams*, 2004 WL 2980027, at *6. Courts have long recognized that nuance, which Defendant's approach disregards, is important to the criminal justice system. In *McCleskey*, the Court observed:

> Individual jurors bring to their deliberations qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. The capital sentencing decision requires the individual jurors to focus their collective judgment on the unique characteristics of a particular criminal defendant. It is not surprising that such collective judgments often are difficult to explain. But the inherent lack of predictability of jury decisions does not justify their condemnation. On the contrary, it is the jury's function to make the difficult and uniquely human judgments that defy codification and that build discretion, equity, and flexibility into a legal system.
> . . . Discretion in the criminal justice system offers substantial benefits to the criminal defendant. . . . Of course, the power to be lenient also is the power to discriminate, but a capital punishment system that did not allow for discretionary acts of leniency would be totally alien to our notions of criminal justice.

*McCleskey*, 481 U.S. at 311-12 (citations, quotations, and footnote omitted);[6] *Sampson*, 275 F. Supp.2d at 88 ("By ignoring the 'individual differences' among criminals, Sampson invites the court to invalidate the FDPA because it does not produce "a false consistency" in the imposition of the death penalty.").

---

been fought in the Supreme Court principally by Justice Scalia and the late Justice Blackmun." Def. Mem. at 43. Because this is "battle . . . fought in the Supreme Court," it is not for this Court to say that the FDPA is unconstitutional because of these two lines of cases. *See Williams*, 2004 WL 2980027, at *7 ("Because the Supreme Court explicitly declined in *McCleskey* to find a constitutional problem with that tension, it is not for this Court to hold otherwise.").

[6] The Court further observed that "[t]he Constitution is not offended by inconsistency in results based on the objective circumstances of the crime." *McCleskey*, 481 U.S. 279, at 307 n.28.

To advance his argument, Defendant relies on a quotation from the Supreme Court's opinion in *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), "that capital punishment be imposed fairly, and with reasonable consistency, or not at all." However,

> *Eddings* cannot stand for the result [Defendant] advocate[s] because, in the same breath as the statement that [Defendant] cite[s], *Eddings* reaffirmed the rule, first articulated in *Lockett*, that the jury's discretion to consider mitigating evidence may not be limited. The Court explicitly stated that the *Lockett* rule "recognizes that a consistency produced by ignoring individual differences is a false consistency."

*Williams*, 2004 WL 2980027, at *7 n.13 (quoting *Eddings*, 455 U.S. at 112).

Accordingly, Defendant's motion is denied with respect to the consistency with which the federal death penalty is imposed. *See id.* at 6-7; *Sampson*, 275 F. Supp.2d at 88.

## C.  Racial And Geographic Disparities In The Application Of The Federal Death Penalty

Defendant next asserts that the statistics from a 2000 Department of Justice study (the "the DOJ Report") on the federal death penalty show that it is disproportionately sought against minority group defendants and in the South. Using these statistics, he makes both constitutional and non-constitutional claims.

## 1.      Racial Disparities

Defendant's arguments with respect to race are foreclosed by the Supreme Court's opinion in *McCleskey v. Kemp*.  In *McCleskey*, the Court began its analysis "with the basic principle that a defendant who alleges an equal protection violation has the

burden of proving "'the existence of purposeful discrimination.'" *McCleskey*, 481 U.S. at 292 (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)). The Court next observed that a "corollary to this principle is that a criminal defendant must prove that the purposeful discrimination 'had a discriminatory effect' on him. *Id.* (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). Thus, the Court concluded, to prevail on a claim under the Equal Protection Clause, a defendant "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *Id.* (emphasis in original).[7] The defendant in *McCleskey* argued that a study, which showed that the death penalty in Georgia was imposed more often on black defendants and killers of white victim, showed that the decision-makers in his case acted with discriminatory purpose. The Court held, however, that statistical studies, such as the ones in this case, were "clearly insufficient to support an inference that any of the decision makers in McCleskey's case acted with discriminatory purpose." *Id.* at 297; *see also Bin Laden*, 126 F. Supp.2d at 260 ("At its core, therefore, *McCleskey* stands for the notion that, by themselves, systemic statistics cannot prove racially discriminatory intent in support of an equal protection claim by a particular capital defendant."). Under *McCleskey*, Defendant cannot establish an equal protection violation using the statistics from the DOJ Report. *See Williams*, 2004 WL 2980027, at *7; *Sampson*, 275 F. Supp.2d at 89-93; *see also Bin Laden*, 126 F. Supp.2d at 260-62.

Defendant attempts to distinguish *McCleskey* on two grounds. First, Defendant argues that unlike the defendant in *McCleskey* who asserted that he was the victim of irrational government conduct, Defendant is being subjected to a system that

---

[7] The Court in *McCleskey* similarly held that the statistical study in support of a claim of racial discrimination could not support a claim under the Eighth Amendment. 481 U.S. at 308-09.

"discriminates systemically." *Def. Mem.* at 68. Second, Defendant argues that unlike in *McCleskey*, where the statistics reflected the decisions of many actors, including individual prosecutors and juries, the statistics from the DOJ Report reflect the decision of only one entity, the Attorney General of the United States. As explained below, Defendant's attempts to distinguish *McCleskey* fail.

Defendant has not shown how the fact that he asserts that he is being subjected to a system that "discriminates systemically" changes the Court's conclusion that statistical studies are insufficient to show discriminatory purpose. In *McCleskey*, the Court observed that the defendant had standing to challenge the state's discrimination based on the statistics relating to the race of the victim because he was asserting his own right to be free from irrational government conduct. *McCleskey*, 481 U.S. at 291 n.8. Here, Defendant claims that in contrast to the defendant in *McCleskey*, he is a victim of a system that "discriminates systemically." Regardless of what is causing Defendant's alleged constitutional injury, however, he is still relying on statistics to support that injury. Accordingly, our analysis of his claim is no different from the Court's analysis in *McCleskey*. "In *McCleskey*, as here, the defendant was required to establish discriminatory intent, which, the Court held, systemic statistics could not do." *Williams*, 2004 WL 2980027, at *8.

Defendant's second argument also fails. Defendant argues that unlike in *McCleskey*, where the Court was concerned about "deducing a consistent state-action 'policy' from the capital-sentencing performances of hundreds of juries and scores of local prosecutors," his "only claim here is prosecutorial discrimination, and, since 1988, all federal capital prosecutions have been personally authorized by a single officer of the

United States, the Attorney General." *Def. Mem.* at 69, 70. However, this Court agrees

with Judge Buchwald that:

> In *McCleskey,* the Court noted that the statistics proffered
> in support of the equal protection claim had a different
> effect than they would have had in the context of a venire-
> selection or Title VII case. In a venire-selection or Title VII
> case, the Court noted, "statistics relate to fewer entities, and
> fewer variables are relevant to the challenged decisions."
> *McCleskey,* 481 U.S. at 295. Defendants' argument that the
> *"fewer entities"* rationale is not present in this case-given
> defendants' contention that "[t]he only claim here is
> prosecutorial discrimination, and, since 1988, all federal
> capital prosecutions ⋯ have been personably [sic]
> authorized by a single officer of the United States, the
> Attorney General"-has a basis in fact. However, defendants
> have not explained why the Court's *"fewer variables"*
> rationale is not sufficient to reach the same result. Nor have
> defendants explained how the statistics at issue here
> constitute the requisite "exceptionally clear proof" of
> discriminatory intent, *McCleskey,* 481 U.S. at 297, in light
> of the Courts determination that similar systemic statistics
> in *McCleskey* did not. Defendants' attempt to distinguish
> *McCleskey* must therefore be rejected.

*Williams*, 2004 WL 2980027, at *8 (footnote omitted). Accordingly, because *McCleskey*

must guide this Court's decision, Defendant's arguments with respect to race are denied.


## 2. Geographical Disparities

Defendant's argument with respect to geography must be denied for the reasons

that Judges Sand and Buchwald of this Court rejected the same argument in *Bin Laden*

and *Williams*, respectively. Defendant did not submit any evidence that similarly situated

defendants in other jurisdictions were not been capitally charged. Moreover, Defendant

has not provided this Court with any basis – statistical or otherwise – to conclude "that

capital charging approval rates should be uniform across the federal districts, in light of

the probability that criminal conduct differs across those jurisdictions." *Williams*, 2004 WL 2980027, at *9. Finally, Defendant does not appear to have suffered a constitutional injury as he is facing the death penalty in the Southern District of New York, where the United States Attorney has sought the death penalty in considerably fewer cases than have been sought in other jurisdictions. *See generally Bin Laden*, 126 F. Supp.2d at 263 ("At most, the DOJ Survey indicates that the 94 U.S. Attorneys in this nation exercise their capital-approval discretion unevenly. The Supreme Court declared in *McCleskey*, however, that '[a]pparent disparities . . . are an inevitable part of our criminal justice system' and 'where the discretion that is fundamental to our criminal process is involved, [courts should] decline to assume that what is unexplained is invidious.' Accordingly, because Defendants have not shown a constitutionally unacceptable risk that geography plays an inappropriate role in federal capital decision-making with respect to this particular prosecution, we reject Defendants' Eighth Amendment claim that the Government's death penalty notices should be dismissed." (quoting *McCleskey*, 481 U.S. at 312-13)); *Williams*, 2004 WL 2980027, at *9.

Defendant's motion to declare the FDPA unconstitutional on the grounds of racial discrimination and regional bias is therefore denied

### 3. Non-constitutional Claims

Defendant also makes two non-constitutional claims. First, defendant argues that there is an explicit statutory right to justice without discrimination under the FDPA. *See* 18 U.S.C. § 3593(f). Second, defendant argues that this Court's supervisory powers over the administration of federal criminal justice allow us to formulate specific procedural rules not specifically required by the Constitution or Congress. According to Defendant,

these powers permit this Court to strike down the federal death penalty if it concludes that there is an impermissible race or region bias. "Because both of these arguments assume that defendants have made a showing of discrimination, and because, as explained above, that assumption is not true, these arguments are likewise rejected." *Williams*, 2004 WL 2980027, at *9 n.17 (rejecting these two arguments); *see also Bin Laden*, 126 F. Supp.2d at 262 n.11 ("Defendants additionally argue that they have been subject to racial discrimination in violation of: (1) implicit rights contained within subsection 3593(f) of the Federal Death Penalty Act . . . . We do not address these three grounds for dismissal since, at bottom, Defendants have failed to demonstrate that they have in fact suffered discrimination on account of their race. As such, dismissal of the Governments' death notices is denied with respect to Defendants' non-constitutional claims as well.").

## 4. Request For Discovery

In the alternative, Defendant, in his opening brief, stated that "recognizing the formidable barrier erected by the Supreme Court's opinion in *United States v. Bass*", he seeks "an explanation" rather than discovery on this issue. In his reply papers, Defendant formally requests this Court to order the Government to produce information in its possession as to "similarly situated" white defendants. *Def. Mem.* at 9-12. Specifically, Defendant asks the government for "produce the names of all white defendants since 1988 who were death eligible, within the Southern District of New York, the Eastern District of New York, the District of New Jersey, and the District of Connecticut. In response to a request from the Court, Defendant and the Government submitted further letter memoranda on this issue.

"A selective-prosecution claim asks a court to exercise judicial power over a special province of the Executive." *United States v. Armstrong*, 517 U.S. 456, 464 (1996)(internal quotations omitted). The Attorney General and U.S. Attorneys have broad discretion to enforce the country's laws, and a "presumption of regularity" supports their prosecutorial decisions. *Id*. Thus, "the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." *Id*. In *Armstrong,* the Supreme Court held that a "credible showing of different treatment of similarly situated persons" is necessary before a defendant is entitled to discovery for a selective prosecution claim. *Id.* at 470; *See also United States v. Bass*, 536 U.S. 862, 863 (2002)("[A] defendant who seeks discovery on a claim of selective prosecution…must make a credible showing that similarly situated individuals of a different race were not prosecuted.")(internal quotations and citations omitted).

Here, in making an initial showing, Defendant produced a list of over 90 white death-eligible defendants whose cases were not authorized for capital prosecution. Without addressing the validity of Defendant's showing regarding discriminatory effect, (which the government of course rebuts), Defendant's request for discovery fails because he has not made some showing on discriminatory intent.

In order to be entitled to discovery, a defendant is required to make some showing of not only a discriminatory effect, but also discriminatory intent. *Bass*, 536 U.S. at 863. *See also United States v. Heatley*, 39 F. Supp.2d 287, 207 (S.D.N.Y. 1999). Neither *Armstrong* nor *Bass* clarify what standard is to be applied with respect to evidence of discriminatory intent, but at least one case in this Circuit has applied a standard similar to the one applied in making a showing of discriminatory effect. *See United States v.*

*Alameh*, 341 F.3d 167, 174 (2d Cir. 2003)(applying "some evidence" requirement for an initial showing of discriminatory intent). In addition, to comport with the substantive requirements of a selective prosecution claim, to establish the discriminatory intent element in support of a request for discovery on a selective prosecution claim, a defendant must produce some evidence that "the decisionmakers *in his case* acted with discriminatory purpose." *McCleskey*, 481 U.S. at 292 (emphasis in original); *see also United States v. Holloway*, 29 F. Supp.2d 435, 441 (M.D. Tenn. 1998). Here, while Defendant has attempted to make a substantial showing with regards to allegedly similarly situated individuals who were not selected for capital prosecution, Defendant has made no showing with respect to discriminatory intent, let alone some showing that prosecutors acted with discriminatory purpose *in his case*. Accordingly, Defendant's request for discovery is denied.

### D. The FDPA Complies with the Fifth Amendment

Defendant next argues that the FDPA "suffers from a fatal flaw made apparent by the Supreme Court's decision in *Ring v. Arizona*." *Def. Mem.* at 73. As explained below, this Court finds that despite Defendant's arguments to the contrary, the FDPA complies with the Fifth Amendment.

In *Ring*, the Court held that under the Sixth Amendment, aggravating circumstances necessary for the imposition of the death penalty must be found by a jury beyond a reasonable doubt. 536 U.S. 584, 602, 609 (2002). In *Ring*, the Court did not address whether the Indictment Clause of the Fifth Amendment requires the grand jury to

make findings about those statutory aggravating factors.[8]  Defendant argues, however, that the Court "[i]n *Ring* . . . and in subsequent cases, the Court established beyond dispute" that such aggravating factors must be charged in an indictment.  This Court will assume, without deciding, that the facts necessary to qualify a defendant for death under the FDPA must be presented by an indictment through the grand jury.[9]  *See, e.g.*, *United States v. Quinones*, 313 F.3d 49, 53 (2d Cir. 2002) (observing, in passing, that "pursuant to *Ring v. Arizona*[,]" statutory aggravating factors "must now be alleged in the indictment"); *United States v. Allen*, 406 F.3d 940, 943 (8th Cir. 2005) ("We therefore conclude that the Fifth Amendment requires at least one statutory aggravating factor and the mens rea requirement to be found by the grand jury and charged in the indictment."); *United States v. Robinson*, 367 F.3d 278, 284 (5th Cir. 2004) ("[T]he government is required to charge, by indictment, the statutory aggravating factors it intends to prove to render a defendant eligible for the death penalty . . . .").

Defendant argues that FDPA does not provide for presentation of aggravating factors to a grand jury (and thereby including them in an indictment), but instead vests authority to identify aggravating favors *exclusively* with the prosecutor.  Therefore, asserts Defendant, this Court must strike down the FDPA because it cannot be amended by the prosecutor or the courts to permit presentation of aggravating factors to a grand jury because it is for the legislature, and the legislature alone, to define crimes and punishment.

---

[8] Because the Fifth Amendment right to a grand jury indictment does not extend to state prosecutions, *see Hurtado v. California*, 110 U.S. 516 (1984), the Court could not and did not consider this issue in *Ring*, which concerned a state court prosecution.

[9] The Government seems to concede this point. *See Government Mem.* at 37. Moreover, because the grand jury in this case charged, in the S9 Indictment, all of the statutory aggravating circumstances that the government intends to prove at trial, the S9 Indictment would satisfy this condition if it were found to be necessary.

The crux of Defendant's argument is that the FDPA precludes the Government from presenting aggravating factors to the grand jury and the grand jury from including those aggravating factors in an indictment. To support his argument, Defendant cites a section of the FDPA, 18 U.S.C. 3593(a), which provides:

> If, in a case involving an offense described in section 3591, the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice (1) stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the government will seek the sentence of death; and (2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

18 U.S.C.A. § 3593(a) (2006). Defendant argues that this language establishes that Congress intended that "the decision to set the machinery of death in motion be reserved exclusively to the government's attorneys, and not allocated to grand juries." *Def. Mem.* at 82. Accordingly, argues Defendant, allowing a grand jury to include aggravating factors in an indictment prior to the government filing a § 3593(a) notice is inconsistent with the plain language of the FDPA. As a result, Defendant urges this Court to strike down the FDPA because it is for the legislature, and not the courts, to rewrite the FDPA.

This Court disagrees with Defendant's argument. For the reasons Judge Buchwald set forth in *Williams*, the FDPA does not vest authority to identify aggravating favors *exclusively* with the prosecutor:

There is simply no language in the FDPA that even mentions grand jury findings, let alone prohibits them with respect to facts constituting aggravating circumstances. In light of the positive background law giving the grand jury authority to return the findings at issue here, we would expect a clear statement in the statute expressing an intent to abrogate that authority if Congress truly intended to do so.

Nor does requiring a grand jury indictment on aggravating circumstances encroach upon the prosecutor's role within the FDPA scheme. Regardless of any grand jury findings, the government must still serve and file its § 3593(a) notice before a death sentence may be sought. Conversely, there is nothing in the FDPA, or anywhere else, to suggest that a grand jury indictment on aggravating circumstances could be construed as a triggering event under the FDPA that would "crank[ ] up the machinery of death" in a way that has heretofore been the function of the § 3593(a) notice. Moreover, as the government notes in its brief, nothing in the FDPA would require the government to include in its § 3593(a) notice any or all of the aggravating circumstances contained in the grand jury indictment. Finally, contrary to defendants' argument, an indictment requirement does not remove discretion in charging decisions from the prosecutor.

*Williams*, 2004 WL 2980027, at *11 (footnotes omitted); *see also United States v. LeCroy*, 441 F.3d 914, 921 (11th Cir. 2006) ("Every circuit court of appeals which has addressed this argument has rejected it. We agree with our sister circuits. The major flaw in LeCroy's argument is that nothing in the Act forbids, or is inconsistent with, prosecutors' taking of the additional step of including the statutory aggravating factors in the indictment and submitting same to the grand jury. Indeed, a statute will seldom expressly provide for submitting elements of an offense to the grand jury. It is simply well-established law-the background against which statutes are enacted-which indicates that elements of a crime should be submitted to the grand jury.") (citations omitted).

Because the Court finds that the FDPA does not prohibit aggravating factors from being included in an indictment, it does not have to be rewritten – either by Congress or the courts – to comport with *Ring*.  As Judge Wolf of the District Court for the District of Massachusetts observed:

> Recognizing a role for the grand jury in deciding whether a defendant shall be subject to the death penalty does not require a rewriting of the Federal Death Penalty Act. The statutory roles of the Department of Justice, the judge, and the jury are not altered. Contrary to Sampson's contention, the notice by the Department of Justice is not rendered redundant if the grand jury's indictment includes allegations concerning the defendant's state of mind and aggravating factors that the Federal Death Penalty Act requires be proven for the defendant to be eligible for the death sentence. The Department of Justice's notice may omit . . . one of the statutory aggravating factors and also may describe additional non-statutory aggravating factors that the government will seek to prove to justify a sentence of death.

*United States v. Sampson*, 245 F. Supp. 2d 327, 336 (D. Mass. 2003); *see also Williams*, 2004 WL 2980027, at *11; *LeCroy*, 441 F.3d at 921; *Allen*, 406 F.3d at 949 ("While it is true that the FDPA directs the government to charge these factors in a notice of intent to seek the death penalty, nothing in the Act precludes the government from also submitting them to the grand jury for inclusion in the indictment."); *Robinson*, 367 F.3d at 290 ("Although Robinson is correct to point out that nothing in the FDPA requires prosecutors to charge aggravating factors in an indictment, he fails to note that there is nothing in that law inhibiting such a charge.  The government can easily comply with both its constitutional obligations (by first going to the grand jury) and its statutory obligations (by later filing a § 3593(a) notice of intention to seek the death penalty). As a result, the statute is not facially unconstitutional."); *United States v. Barnette*, 390 F.3d

775, 789 (4th Cir. 2004), *vacated on other grounds by* 126 S. Ct. 92 (2005) ("One flaw in Barnette's reasoning is the assumption that the Federal Death Penalty Act precludes the grand jury from charging aggravating factors in the indictment. A review of the statute itself reveals no language that restricts the government from submitting aggravating factors to the grand jury.").

Despite Defendant's assertion, the Supreme Court's opinion in *United States v. Jackson*, 390 U.S. 570 (1968) does not provide a perfect analogy to the circumstances in this case. In *Jackson*, the Court held that the death penalty provision of the Federal Kidnaping Act was unconstitutional. *Id.* at 572. The provision created an offense punishable by death "if the verdict of the jury shall so recommend," *id.* at 571, which meant that the death penalty was only possible for those defendants who exercised their right to a jury trial. For those defendants who did not exercise that right – for example, by consenting to a bench trial or by pleading guilty – there was no procedure under which those defendants could be exposed to a possible death sentence. The government argued that to save the statute, the Court could construe it to allow the trial judge both "to set aside a jury recommendation of death," *id.* at 573, and, in cases where a defendant waived his or her right to a jury trial, "to convene a special jury for the limited purpose of deciding whether to recommend the death penalty." *Id.* at 572. The Court disagreed, observing that

> It is one thing to fill a minor gap in a statute-to extrapolate from its general design details that were inadvertently omitted. It is quite another thing to create from whole cloth a complex and completely novel procedure and to thrust it upon unwilling defendants for the sole purpose of rescuing a statute from a charge of unconstitutionality.

*Id.* at 580; *see also Williams*, 2004 WL 2980027, at *12 n.25 ("In rejecting the government's argument and holding that the statute could not be so construed, the Court held that the language and legislative history of the statute showed both that Congress had intended the jury's choice of death to be determinative and that Congress had *not* intended to authorize the empaneling of a 'special jury' to deliberate on the death sentence, which would have been a 'procedure unique in the federal system.'" (quoting *Jackson*, 390 U.S. at 576)).  Here, in contrast, by allowing a grand jury to include aggravating factors in an indictment, this Court does not "create from whole cloth a complex and completely novel procedure."  Moreover, there is nothing in the FDPA or its legislative history that prevents a grand jury from doing so.  In short, "[t]he FDPA simply does not need to be rewritten as the Federal Kidnaping Act did." *Williams*, 2004 WL 2980027, at *12 n.25.

## E.  Execution of Innocent People

Defendant next argues that this Court should "determine whether, in fact, the federal death penalty is likely to lead to the execution of one or more innocent people," *Def. Mem.* at 115-16, despite the Second Circuit's ruling in *United States v. Quinones*, where the court reversed Judge Rakoff's holding that the risk of executing innocent people rendered the federal death penalty unconstitutional.  313 F.3d 49 (2d Cir. 2002)

Regardless of what this Court might find if it took Defendant up on his request to engage in a fact-finding mission, it is precluded from finding that because innocent people will die, the death penalty is unconstitutional.  The Second Circuit, relying on Supreme Court precedent, foreclosed that argument in *Quinones*. *Id.* at 68-69 ("The Supreme Court thereby made clear that, once an individual has exhausted his available

legal remedies, the Due Process Clause no longer entitles him to an opportunity to demonstrate his innocence.  Accordingly, the Supreme Court established in *Herrera* that there is no fundamental right to the opportunity for exoneration even before one's execution date, much less during the entire course of one's natural lifetime."); *see also Williams*, 2004 WL 2980027, at *9-10; *Sampson*, 275 F. Supp.2d at 54-60.  Accordingly, the Court denies Defendant's request for this Court "determine whether, in fact, the federal death penalty is likely to lead to the execution of one or more innocent people."

### F.  *Per se* Constitutionality of the Federal Death Penalty Act

Defendant argues that the death penalty is *per se* unconstitutional as it is cruel and unusual punishment and it violates due process.  In making this argument, "Defendant recognizes, as he must, that every present member of the United States Supreme Court apparently accepts the proposition that the death penalty, under some circumstances, is constitutional."  *Def. Mem.* at 126. In addressing Defendant's argument, this Court, once again, must return to a familiar refrain.  While it may be time, given "evolving standards of decency," *Def. Mem.* at 126, to revaluate the death penalty, that is a task the Supreme Court, and the Supreme Court alone, must undertake.  *See, e.g.*, *Quinones*, 313 F.3d at 61-62, 62 n.10 ("And the Supreme Court expressly held in *Gregg* that, to the extent our standards of decency have evolved since the enactment of the Constitution, they still permit punishment by death for certain heinous crimes such as murder."); *Williams*, 2004 WL 2980027, at *5 ("If [the Supreme Court] decisions are to be reevaluated in light of evolving 'standards of decency' under the Eighth Amendment, as defendants urge, they

must be reevaluated by the Supreme Court, not us.").

## G. The Statutory Aggravating Factors in the Government's Notice of Intent

There are limits as to what aggravating factors may be submitted to the jury. An aggravating factor cannot be unconstitutionally vague. *See Tuilaepa*, 512 U.S. at 972-75 (observing that a "basic principle" is that "a factor is not unconstitutional if it has some common-sense core of meaning . . . that criminal juries should be capable of understanding" (citation and quotation omitted)). Moreover, an aggravating factor must not be overbroad.[10]  *See id.* ("[T]he circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder.")

### 1. Pecuniary Gain

The S9 Indictment and the Notice of Intent allege that Defendant committed the charged murders "as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value."  18 U.S.C. § 3592(c)(8).  According to the Government, this aggravating factor is based on the fact that Defendant committed the murders in order to steal money and narcotics.

---

[10]  At least two district courts in the Southern District of New York have found that three additional requirements for aggravating factors. First, "an aggravating factor must be particularly relevant to the sentencing decision, such that it provides a principled basis to enable the sentencer to distinguish those who deserve death from those who do not." *Williams*, 2004 WL 2980027, at *16 (quotation omitted); *see also Bin Laden*, 126 F. Supp. 2d at 298. Second, "an aggravating factor's probative value must not be outweighed by 'the danger of creating unfair prejudice, confusing the issues, or misleading the jury.'" *Williams*, 2004 WL 2980027, at *16 (quoting 18 U.S.C. § 3593(c)). Third, "an aggravating factor must not be duplicative of or necessarily subsumed by another aggravating factor." *Williams*, 2004 WL 2980027, at *16 (quotation omitted); *see also Bin Laden*, 126 F. Supp. 2d at 298.  Because these factors are not relevant to the instant discussion, this Court does not need to decide whether they are a necessary prerequisite before an aggravating factor can be presented to a jury.

Defendant argues that this factor should be stricken because it is not a murder for hire situation or a situation "where the murder will lead directly to a financial benefit, such as the collection of life insurance proceeds." *Def. Mem.* at 112. The Court will not, however, strike this factor at this stage of the proceedings. Given the Government's allegation that Defendant murdered two individuals in order to steal money and narcotics, the Government may be able to show that the killings were "the sort of murder[s] in which pecuniary gain can be expected to follow as a direct result of the crime." *Cuff*, 38 F. Supp.2d at 288. Ultimately, "whether this factor applies or not will depend on the proof adduced at trial." *Id.* Accordingly, Defendant may renew his motion at a later stage of the proceedings.

**2. Substantial Planning and Premeditation**

The S9 Indictment and the Notice of Intent also allege that Defendant committed the charged murders after "substantial planning and premeditation." 18 U.S.C. § 3592(c)(9). Defendant argues that this factor is unconstitutionally vague because it requires jurors "to fix the illusive and highly subjective point at which 'planning and premeditation' crosses an imaginary dividing line and becomes '*substantial* planning and premeditation.'" *Def. Mem.* at 113. In so arguing, he recognizes that this claim has been rejected by many other courts. *See Bin Laden*, 126 F. Supp.2d at 296 n.7 (collecting cases). Those courts have found that this aggravating factor sufficiently channels the jury's deliberations. *See, e.g.*, *United States v. Frank*, 8 F. Supp.2d 253, 278 (S.D.N.Y. 1998). "For the reasons articulated in those decisions, we reject [Defendant's] challenge here." *Williams*, 2004 WL 2980027, at *17.

**H. Non-Statutory Aggravating Factors**

Defendant next argues that the FDPA does not authorize the utilization of non-statutory aggravating factors. This argument is without merit.

As noted by the government and by Defendant, Section 3591(a) of the FDPA provides that, in considering the application of the death penalty, a jury is to consider factors set forth in section 3592. Section 3952, in turn, lists 16 statutory aggravating factors, and then states "[t]he jury, or if there is no jury, the court, may consider *whether any other aggravating factor for which notice has been given* exists." (emphasis added) The plain text of the FDPA therefore authorizes the use of factors not specifically enumerated in the statute. *Williams*, 2004 WL 2980027 at *14; *see also Robinson*, 367 F.3d at 292 (argument that "the FDPA does not authorize the use of non-statutory aggravating factors [is] meritless". Defendant's motion to strike non-statutory aggravating factors is therefore denied.

**I. Dismissal of the § 924 Counts**

While suggesting that the Court should dismiss the aggravating factors relating to 18 U.S.C. § 924 counts of the indictment (relating to the use of firearms), Defendant appears to seek dismissal of the § 924 counts themselves.[11] In essence, Defendant argues that these counts should be dismissed because it is "irrational" to create a capital offense based on the fact that a crime was committed with a firearm. *See Def. Mem.* at 125. In support of his position, the government cites Judge Mukasey's opinion in *United States v. Cuff*, which held that a "predicate to fulfilling the constitutional

---

[11] In its Amended Notice of Intent, the government does not seek to prove any aggravating factors related to the possession of firearms.

conditions for an aggravating factor is that the disputed factor be an aggravating factor in the first place". 38 F. Supp.2d at 288. Judge Mukasey further held that "[u]se of a firearm in connection with a homicide does not meet that predicate for the simple reason that use of a firearm does not, in any rational sense, make a homicide worse." *Id. See also Williams*, 2004 WL 2980027, at *19 (agreeing with Judge Mukasey's reasoning and granting defendants' motion to strike a firearms aggravating factor). Defendant argues that if it is irrational to utilize possession of a firearm as an aggravating factor, it is "equally (if not more)" irrational to create offense based on the same premise.

This argument is without merit. "The logic behind striking the firearms aggravator is that it is not an aggravator at all. That logic does not apply to elements of the underlying capital offense because there is no constitutional requirement that those elements aggravate the crime." *See id.* (rejecting defendants' argument that the firearms elements of a capital offense be stricken on the grounds that "[i]f it is irrational to utilize the fact that the crime was committed with a firearm as an aggravating factor, it is equally (and perhaps even more) irrational to create a capital offense based on the same premise")(internal quotations and citations omitted). Defendant's motion to strike the § 924 counts of the indictment is therefore denied.

## J. The Beliefs of the United States Attorney for the Southern District of New York

Defendant argues that application for the death penalty is not authorized under the FDPA in this case because it is "a precondition to a capital prosecution [that] the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter…" *Def. Mem.* at 121 (citing 18 U.S.C. § 3593(a).

Defendant argues that since the U.S. Attorney for the Southern District of New York does not believe that a sentence of death is justified, and recommended to the Department of Justice that capital punishment not be authorized, the government's prosecution does not comply with the requirements of the FDPA.  This argument is without merit.

Defendant's argument has been flatly rejected by several courts which have considered it.  *See, e.g.*, *Williams,* 2004 WL 2980027 at *15-16; *United States v. Quinones*, No. 00-761, 2004 WL 1234044, at *3 (S.D.N.Y. June 3, 2004); *United States v. Kee*, No. 98-778, 2000 WL 863119 at *5 (S.D.N.Y., June 27, 2000); *United States v. Cooper*, 91 F. Supp.2d 90, 114 (D.D.C. 2000).  Furthermore, Defendant has presented no basis to hold that the local United States Attorneys, rather than the Attorney General of the United States (or the Assistant United States Attorney(s) prosecuting the case) are the subject of § 3593(a).  Indeed, as noted by Judge Rakoff in *Quinones*, the legislative history of the FDPA makes clear that "[t]he Attorney General is the attorney for the Government".  *Quinones*, 2004 WL 1234044, at *3.  This Court holds that nothing in the FDPA requires that, for a capital prosecution to be authorized, the United States Attorney in the prosecuting jurisdiction must recommend to the Department of Justice that a capital prosecution must be authorized.  Defendant's motion to strike the FDPA aggravating factors is denied.

## III. Conclusion

For the reasons set forth above, Defendant's death penalty motions are DENIED

The Government is permitted to serve an amended Notice of Intent to Seek the

Death Penalty against Khalid Barnes that is consistent with this opinion.

*It is so ordered.*

Dated: White Plains, New York
        January 24 , 2008

Stephen C. Robinson, U.S.D.J.